IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>    v.<br><br>JOSE ALBERTO RODRIGUEZ, JR.,<br><br>          Defendant. | Case No. 3:17-cr-00031-TMB<br><br>ORDER REGARDING DISPARITY IN METHAMPHETAMINE SENTENCING |

## I. INTRODUCTION

The purpose of this order is to articulate the Court's concern with how methamphetamine is treated by the United States Sentencing Guidelines ("U.S.S.G., "Sentencing Guidelines," or "Guidelines") generally and as applied in this case. Specifically, it is intended to more fully explain the Court's sentencing methodology going forward in regard to base offense level determinations for methamphetamine as found in the Sentencing Guidelines. For the reasons explained below, the Court finds that the Guideline's distinction between pure or "actual"[1] methamphetamine and less pure mixtures when determining a base offense level undermines the sentencing goals articulated in 18 U.S.C. § 3553(a) and creates an arbitrary distinction that is unrelated to a defendant's culpability. Accordingly, the Court will routinely grant downward variances—subject to individual exceptions—to correct this disparity.

---

[1] The Court interchangeably uses the terms "actual" and "pure" to refer to methamphetamine with a base minimum level of purity: specifically, any methamphetamine determined to be at least 80% pure or higher.

1

## II. BACKGROUND

The Sentencing Guidelines were enacted to promote the dual goals of uniformity and proportionality in sentencing.[2] The United States Sentencing Commission, established in 1984 by the Sentencing Reform Act, is responsible for creating the Guidelines for all federal offenses.[3] Although originally intended to be mandatory, following the Supreme Court's decision in *United States v. Booker*,[4] the Guidelines now serve an advisory purpose, and are "the starting point and the initial benchmark" in sentencing criminal defendants.[5]

The Drug Quantity Table found in § 2D1.1(c) of the Guidelines is the starting point for calculating the base offense level for drug crimes under the U.S.S.G.[6] For most drug offenses, the base offense level reflects the type and quantity of drug(s) involved.[7] For methamphetamine, however, the Guidelines "distinguish between two forms of methamphetamine powder: actual and mixture."[8] The base offense level for methamphetamine depends on the purity of the drug

---

[2] *See* 28 U.S.C. §§ 991(a), 991(b)(1), 994(f). *See also* 18 U.S.C. 3553(a).

[3] *See Mistretta v. United States*, 488 U.S. 361, 362 (1989) (citing 18 U.S.C. § 3551 *et seq.*).

[4] 543 U.S. 220, 246 (2005).

[5] *Gall v. United States*, 552 U.S. 38, 49 (2007).

[6] To calculate the Guideline range for a particular defendant, the Court begins by determining the offense guideline section applicable to the offense of conviction. U.S.S.C. § 1B1.1(a)(1). Then, the Court looks to the base offense level for that offense contained in chapter two of the Guidelines. *Id.* at 1B1.1(a)(2).

[7] *See* U.S.S.G. § 2D1.1

[8] *United States v. Hayes*, 948 F.Supp.2d 1009, 1024 (N.D. Iowa 2013). *See also United States v. Austin*, No. 1:18-CR-023-BLW, 2018 WL 4087987, at *2 (D. Idaho Aug. 27, 2018) ("Methamphetamine, unlike most controlled substances, is to be quantified based on purity, using either the weight of a mixture containing the drug or the weight of the pure drug itself contained within the mixture, whichever yields the greater offense level." (citing U.S.S.G. § 2D1.1, Notes to Drug Quantity Table (B))).

involved, using a 10:1 ratio to distinguish between pure, or "actual," methamphetamine and an equivalent total weight of a mixture containing methamphetamine.[9] The result is that 10 grams of pure methamphetamine is treated the same as 100 grams of methamphetamine mixture for calculating a defendant's Guidelines sentencing range.[10]

In practice, the distinction between actual methamphetamine and a mixture containing methamphetamine can significantly affect the base offense level of methamphetamine criminal sentencing, and can—and as discussed below, does—ultimately result in divergent sentencing outcomes for similarly situated defendants. For example, a criminal defendant charged with possession of 25 grams of mixed methamphetamine starts with a base offense level of 18 under the Sentencing Guidelines; however, should the same 25 grams of methamphetamine be determined to be at least 80 percent pure, the base offense level increases to a level of 26.[11] Assuming no other sentencing enhancements or downward variations and a criminal history of I,

---

[9] *Id*. This reflects the distinction established by Congress in the mandatory minimum sentences for methamphetamine. *See* 21 U.S.C. §§ 841(b)(1)(A)(viii), 841(b)(1)(B)(viii). *See also* United States Sentencing Commission: Methamphetamine Report (1999), at 18–19; *available at* https://www.ussc.gov/sites/default/files/pdf/research/working-group-reports/drugs/199911_Meth_Report.pdf. This has led some courts to conclude that the methamphetamine guideline ranges were "a product of political calculation and compromise rather than empirical analysis," asserting that no "empirical data from the Sentencing Commission or in the academic literature . . . would justify the ratio." *United States v. Hendricks*, 307 F.Supp.3d 1104, 1106–07 (D. Idaho. 2018).

[10] Because of this distinction, "there are two methods for determining a defendant's base offense level in methamphetamine powder cases, either by the weight of the actual methamphetamine contained within a mixture or by the weight of the entire mixture containing a detectable amount of methamphetamine." *Hayes*, 948 F.Supp.2d at 1024 (citing § 2D1.1(c)). The Guidelines direct: "[i]n the case of a mixture or substance containing [methamphetamine], use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the [actual methamphetamine], whichever is greater." U.S.S.G. § 2D1.1, Notes to Drug Quantity Table (B).

[11] *See generally* U.S.S.G. § 2D1.1(c).

a defendant possessing 25 grams of mixed methamphetamine faces a Guidelines range of 27–33 months, whereas a defendant possessing 25 grams of pure or actual methamphetamine faces a Guidelines range of 63–78 months.

### III. LEGAL STANDARD

Pursuant to the Supreme Court's decision in *United States v. Booker*, the Sentencing Guidelines are "one factor among several courts must consider in determining an appropriate sentence."[12] While "the Guidelines should be the starting point and initial benchmark" of the sentencing process, and must be considered as a factor in sentencing, they "are not the only consideration."[13] After calculating the Guidelines range, the Court "should then consider all of the [18 U.S.C.] § 3553(a) factors" to make an "individualized assessment based on the facts presented."[14] In making this determination, the Court "may not presume that the Guidelines range is reasonable."[15] "The Supreme Court has emphasized this point, noting '[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable,' and that '[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.'"[16] Ultimately, in sentencing, the Court is guided by the principle of

---

[12] *Kimbrough v. United States*, 552 U.S. 85, 90 (2007) (citing *Booker*, 543 U.S. at 244).

[13] *Gall*, 552 U.S. at 49. *See also Kimbrough*, 552 U.S. at 90–91. Note, however, that "district courts are required to properly calculate and consider the [G]uidelines when sentencing, even in an advisory guideline system." U.S.S.G. Ch. One, Pt. A, Subpt. 2.

[14] *Id*. at 50.

[15] *Id*.

[16] *Hayes*, 948 F.Supp.2d at 1013 *(*quoting *Nelson v. United States,* 555 U.S. 350, 352 (2009) (*per curiam*) (emphasis in the original)).

parsimony: "[t]he court's central task must be to impose a sentence 'sufficient, but not greater than necessary,' to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2)."[17]

It is well settled—and neither party disputes—that "[s]entencing judges may impose sentences that vary from the Guidelines range based on a policy disagreement with the Guidelines."[18] In fact, under *Spears v. United States*, the deviation need not be "based on an individualized determination;" rather, district courts can "reject and vary categorically" from certain Guidelines for policy reasons, among them the factors identified in § 3553(a).[19] Ultimately, "sentencing judges can reject *any* Sentencing Guideline, provided that the sentence imposed is reasonable."[20] "This is especially true where the Guidelines provisions 'do not exemplify the Commission's exercise of its characteristic institutional role[,]' which is 'to base its determinations on empirical data and national experience.'"[21]

### IV. DISCUSSION

Under the Sentencing Guidelines, the base offense level for methamphetamine offenses depends on the purity of the drug, and the Guidelines calculation relies on a 10:1 ratio between actual and mixed methamphetamine.[22] The Court disagrees with this distinction on policy grounds.

---

[17] *Hendricks*, 307 F.Supp.3d at 1106. *See also Kimbrough*, 552 U.S. at 571–72.

[18] *Hayes*, 948 F.Supp.2d at 1014 (citing *Spears*, 555 U.S. at 263–67 and *Kimbrough*, 552 U.S. at 109–10).

[19] *Spears*, 555 U.S. at 265.

[20] *United States v. Mitchell*, 624 F.3d 1023, 1029 (9th Cir. 2010). *See also United States v. Henderson*, 649 F.3d 955, 963 (9th Cir. 2011).

[21] *Austin*, 2018 WL 4087987, at *2 (citing *Kimbrough*, 552 U.S. at 109).

[22] This ratio was first introduced in the 1989 Sentencing Guidelines. *United States v. Dunn*, No. 1:18-CR-00062-BLW-1, 2018 WL 5809944, at *2 n. 2 (D. Idaho Nov. 6, 2018 ("Congress first introduced the methamphetamine purity distinction in the 1988 Anti-Drug Abuse Act, in which the weight quantity of methamphetamine mixture triggering each mandatory minimum was

The distinction between actual and mixed methamphetamine does not comport with the reality of how methamphetamine is created, trafficked, and sold today, and creates an arbitrary distinction between defendants that runs contrary to the § 3553(a) factors. For the reasons explained below, the Court will thus routinely vary from this distinction in the advisory guidelines as is authorized under *Kimbrough* and *Spears*.[23]

First, as has been noted by several other district courts, the current reality is that "methamphetamine is almost always imported from foreign drug labs and the purity levels are much higher."[24] Under the current Guidelines range, the presumed purity of untested methamphetamine is 10 percent.[25] As of 1999, however, the Sentencing Commission indicated that average nationwide purity rates were around 50 percent.[26] This number has continued to rise:

---

set at ten times the quantity of the pure methamphetamine triggering that same statutory minimum penalty. The Commission responded by amending the Guidelines to reflect the 10-to-1 mixture/pure substance ratio." (citing United States Sentencing Commission, *Methamphetamine: Final Report*, at 7 (Nov. 1999), http://www.ussc.gov/sites/default/files/pdf/research/working-group-reports/drugs/199911_Meth_Report.pdf.)).

[23] *Kimbrough*, 552 U.S. at 109–110; *Spears*, 555 U.S. at 264. *See also United States v. Valdez*, 268 F. App'x 293, 297 (5th Cir. 2008) (holding that "the district judge can disagree with the Guidelines' policy that purity is indicative of role").

[24] *Hendricks*, 307 F.Supp.3d at 1107. *See also Dunn*, 2018 WL 5809944, at *3 ("Simply put, the presumed purity of 10% for untested methamphetamine is no longer valid."); *United States v. Ortega*, No. 8:09CR400, 2010 WL 1994870, at *1 (D. Neb. May 17, 2010) ("The government acknowledged at the sentencing hearing that the purity of most methamphetamine on the street now is 40%–50% and that it is now uncommon to find methamphetamine of a low level of purity being sold.").

[25] *See Dunn*, 2018 WL 5809944, at *2. Some district courts have suggested that this presumption "based on the assumption that most methamphetamine was produced in a home lab where purity levels of approximately 10% were typical . . . until approximately 20 years ago." *Id*.

[26] United States Sentencing Commission, *Methamphetamine: Final Report*, at 7 (Nov. 1999), http://www.ussc.gov/sites/default/files/pdf/research/working-group-reports/drugs/199911_Meth_Report.pdf.

across North America, after a brief period of decline between 2005 and 2008, "the purity of methamphetamine continues to increase steadily . . . reaching about 93 percent in 2012."[27] "Between 2002 and 2005 . . . the average purity increased from 49 percent to 69 percent."[28]

These global trends in the methamphetamine market are reflected by the trends observed within the District of Alaska. An informal survey of defendants sentenced for methamphetamine related drug charges in this district[29] found that where purity of seized methamphetamine was sent to a laboratory for testing, the results indicate that purity generally exceeded 89 percent. Notably, there is only one criminal sentencing since 2015 where purity testing was performed on seized methamphetamine and the resulting base level offense was determined using mixed methamphetamine; in other words, since 2015, where the methamphetamine was sent for testing, in all but one case the purity was at least 80 percent and, thus, the defendant was subject to the heightened base offense level. These findings are similar to those that from other district courts

---

[27] Review: Global Patterns of Methamphetamine Use. Wolters Kluwer Health, Inc. 2015, *available at* https://www.ncbi.nlm.nih.gov/pubmed/26001916. Notably, this same study also indicated that due to changes in how methamphetamine is synthesized, "such an increase in purity does not always translate to an increase in potency." *Id*. This statement undercuts the Government's repeated assertion that methamphetamine with a greater purity level is uniformly more dangerous than less pure forms of the drug. *See* Dkt. 93 at 9–10.

[28] J.C. Maxwell and B.A. Rutkowski, *The prevalence of methamphetamine and amphetamine abuse in North America: A review of indicators, 1992 –* 2007, Drug and Alcohol Review (May 2008), 27, 229–235. Moreover, to the extent that Government argues the distinction is appropriate because pure methamphetamine is more profitable, that assertion is not supported by available information. *See id* (stating that during this same period, "price of a gram of [pure methamphetamine] across the United States decreased from $120 – 700 to $ 30 – 700").

[29] The United States Probation Office for the District of Alaska compiled an informal survey for the purposes of assisting the Court in drafting this Order. The informal survey identified criminal cases in the District of Alaska where defendants were sentenced for violations under 21 U.S.C. § 841 and/or § 846 between 2015 and the present, and identified relevant sentencings. The informal survey excluded cases where defendants were sentenced for methamphetamine offenses as well as other charges, or where defendants possessed controlled substances other than or in addition to methamphetamines.

that have examined this issue.[30] Ultimately, this shift in the landscape means that pure methamphetamine is not unique or rare, nor does current data suggest that the purity of methamphetamine is in any way an indicator of heightened culpability for a particular defendant.[31]

In practice, the result of this trend in purity levels overall means that when methamphetamine is tested for purity, defendants will nearly always be subject to a substantially higher Guidelines penalty range. The difference in practical terms is substantial:

> "Take, for example, a case involving a methamphetamine mixture of 150 grams and 90% purity. Had purity testing been performed, the base offense level would be 30, while the base offense level for untested methamphetamine would be 24. Assuming no adjustments and a Criminal History Category of I, the Guidelines range without purity testing is 51–63 months. With purity testing, the Guidelines range balloons to 97–121 months—an increase in the Guidelines range of over 90% attributable to the fact of testing alone."[32]

Yet the reason why testing is or is not performed in any given case is often arbitrary: in Alaska, testing for purity is almost always performed and reported for sentencings where the case started under the jurisdiction of a federal law enforcement agency. However, for cases referred by a state or local law enforcement agency, testing for purity—and whether the results of that testing are subsequently reported for sentencing purposes—occurs in only approximately half of such cases. Moreover, there are cases where the results of lab testing were not ready at the time of sentencing—or were not reported at all for sentencing purposes—resulting in an arbitrary distinction as to whether any particular defendant's base level offense is grounded on actual or mixed methamphetamine. For instance, in three separate identified sentencings, the presentence report

---

[30] *Hendricks*, 307 F.Supp.3d at 1107 ("A recent 2015–16 survey of drug purity levels in the District of Idaho revealed an average purity level of 92.6% with a low of 88% and a high of 100%.").

[31] *See Austin*, 2018 WL 4087987, at *3 ("Purity is also a less meaningful proxy for culpability where nearly all methamphetamine sold is of 90 percent purity or greater.").

[32] *Dunn*, 2018 WL 5809944, at *3.

noted that a lab report detailing the purity level of the methamphetamine was not yet received by the time of the issuance of a final presentation report, and that the recommendations and analysis was therefore based on the lower Guidelines range.[33]

Taken in sum, this suggests that the Guidelines sentencing ranges—which are grounded in outdated assumptions about purity of methamphetamine and where results for any particular defendant can depend on the availability of testing—no longer align with the goals articulated in 18 U.S.C. § 3553(a). Specifically, 18 U.S.C. § 3553(a)(2)(A) identifies "the need for the sentence imposed . . . to reflect the seriousness of the offense," and 18 U.S.C. § 3553(a)(6) directs the Court "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Yet the Court finds that the current Guidelines methodology leads to just such disparities and arbitrary differences. The enhanced base offense level for actual methamphetamine does not reflect culpability, severity of offense, or proximity to the source, but today is often simply an indicator that lab testing was performed and received in time for sentencing. This runs directly counter to §3553a(2)(A), divorcing the recommended penalty under the Guidelines from any indicator of the "seriousness of the offense." And, perhaps more importantly, the differences in Guidelines ranges for actual versus mixed methamphetamine can result in materially different base offense levels depending primarily on whether the seized drugs

---

[33] Here the Government's arguments reflect the arbitrary nature of the enhanced base offense level due to the purity level of methamphetamine. In supplemental briefing on this issue, the Government argues that the "fact that some defendants may have received a windfall because their drugs were not subjected to purity analysis is not a reason to depart downward on cases where the methamphetamine turns out to be predictably pure." Dkt. 93 at 10. But whether defendants receive a "windfall"—as the Government notes—depends almost entirely on the discretion of the Government actors involved in a particular case or the ability of the Government to test the methamphetamine at issue in the case. Such an enhancement in the base offense level is arbitrary where testing in cases is not uniformly applied across similarly situated criminal defendants.

were, in fact, tested, a fact unrelated to any conduct or action by the defendant. This creates just the type of arbitrary distinction against which § 3553(a)(6) is meant to guard.

The Court thus finds that the methamphetamine Guideline ranges produce advisory sentencing ranges that fail to achieve these factors. Because of this, the Court will routinely grant downward variances to correct for the disparity that can result based solely on whether methamphetamine was tested and the purity.

## V. CONCLUSION

For the foregoing reasons, and absent a showing of unique circumstances in a specific criminal matter, the Court will routinely grant downward variances from the Guidelines range for methamphetamine offenses where the base offense level is enhanced due to the tested purity of the methamphetamine to ensure that sentences are not greater than necessary to accomplish the purposes of sentencing under 18 U.S.C. § 3553(a).

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 5th day of April, 2019.

/s/ *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE